May it please the Court, I'm Karen Landau, and I represent Jagpreet Sekhon. As the Court knows, we're going to reserve collectively five minutes for rebuttal. And I will attempt to stick to my own. I'm sorry. Tell me again who you represent. I represent Jagpreet Sekhon. Okay. And, again, we're going to collectively reserve five minutes for rebuttal. So I would like to address two issues in the brief time that I have. First, primarily, the point that the stamps and the signatures, admission of the stamps and the signatures violated the Confrontation Clause. And if I have a minute left, I'll address the question of abuse of trust. As is pretty clear from our briefs, the government devoted two witnesses and there was evidence from a third, actually from a third and a fourth, that they introduced stamps and signatures that came from Romanian doctors and pastor and Indian doctors. And the fundamental point of these stamps and signatures was that the stamps and signatures that were present in documents in the alien files of the Sekhon clients were fraudulent. The stamps and signatures violate the Confrontation Clause for several reasons. But first, the point that they're not genuine. Sotomayor, there was, Counsel, a witness who testified that they were not genuine, correct? Well, there was the one witness. There was the one Romanian doctor, and she testified as to her own, her own stamp and signature, not as to the others. The witnesses, Michael Mates and Robert Temple and, I believe, Rajiv Sharma, ultimately the Court redacted, limited the testimony and just admitted that the stamp Would the testimony of the one Romanian doctor have been sufficient to support the claims, the government's claims? I'm sorry, when you say the government's claims, that all of them were fraudulent? Well, is that enough to support the jury's verdict? If we have the one Romanian doctor who comes forward and says What you're asking is if it's harmless error, is what you're asking. Well, yeah, I'm asking about a sufficiency of the evidence question, I guess. It's a little different way of thinking about it. Well, first of all, we're not arguing that the evidence is insufficient. But second of all, and I think more to the point, is that certainly the jury could have drawn an inference from the testimony of Ludovica and Amhel and her testimony that her stamp was fraudulent, that the other ones were fraudulent. But the jury might not necessarily have drawn that inference. Right. But if all they had, I guess my question is, if all they had was her testimony, would that have been a sufficient basis on which to support these verdicts? No, I don't think so. And is there a con – there's no confrontation objection with respect to her, right? No, there can't be, because she was confronted. Okay. But the question is all of the others. And there was So how many of the clients did her testimony go to? Well, I believe all of the charged – oh, to her, her testimony? Yeah. Oh, only one. Only one. Unless I'm – I mean, I may be mistaken. So her stamp was only invoked in one client? With regard to her, yes, that's right. That's right. That's right. And I have not gone through the record and parsed out, and this is my fault, but, you know, in the sense that I haven't gone and parsed out and said, this stamp relates to this count. Your argument, excuse me, depends on a conclusion that the stamps are testimonial in nature rather than physical evidence. If, for example, we were dealing with, you know, fraudulent Biedermeier furniture, the furniture wouldn't be cross-examined, because it's an object, and it's either a fake or a real one. And why isn't this a physical object, the way, let's say, a counterfeit dollar bill would be a physical object, and you would say, it's a fake one, it contains words, but it's a fake dollar bill? Well, two reasons. First of all, the stamps and the signatures, in the way they were procured, were prepared for litigation purposes. Under Bullcoming, that distinguishes the stamps and the signatures from something like a fingerprint, which exists, which is obtained by a disinterested bureaucrat for recordkeeping purposes. But second of all they are collected in the normal course of business for recordkeeping purposes. So why does that matter, because if you go back to my counterfeit dollar bill example, you wouldn't prepare that counterfeit dollar bill in anticipation of litigation. But, Your Honor, and there's another way of looking at this, and that is that if you look at the signatures and the stamps and the way that they came in, yeah, the stamps may, they may or may not have existed prior to the litigation in this case. We don't really know, because the witnesses who owned the stamps weren't confronted, and the stamps were never properly authenticated. But what we do know Which stamps are you talking about, ma'am? The stamps and the signatures that were introduced by the government, the ones that were stamped on the page. The genuine ones? But the other point is that they were, they were connected to this assertion that they were the genuine, the genuine stamps, and the other ones were forgeries. And you can't help but make that, but you can't help but see that message, because when you look at the documents, what you have, if you look at the exhibits and the that the government believed to be fraudulent, and then actually there was a statement on them, and those are redacted out, they're black, they're inked out, so the jury knows that there was something that's, they're not being told, and here you have the stamp, and the government says, well, here's this stamp, and then here's the other one. So the message of forgery is clear, and you really cannot divorce the stamps from that message, and that's what makes them assertive conduct as opposed to I don't understand that at all. It's no different than handing them a genuine dollar bill and a fake dollar bill and saying, here's a genuine dollar bill, and here's the dollar bill that was given to someone in payment of something. The dollar bills are not testimonial. They may, you know, they may be now. I'm not sure if that's the case. You have bills that way now. I'm doing it now. But I have to respectfully disagree, because I think if you look, if you look at the exhibits and how they came in, and also if you look at the Eighth Circuit case, the Kausovik case, I mean, you can say the same thing about a conviction. I mean, the Eighth Circuit said, well, when you're admitting a judgment, we can admit a judgment to prove that there was a prior criminal conviction, but that's different than admitting it to prove that what the defendant said to the immigration authorities was fraudulent.  the case, and I think that's the case, and I think that's the case. Well, that may be, but you're still the question is, we're still dealing with an inanimate object, aren't we? I mean, is there the this all goes back to Crawford, I take it. So is there any authority, now that we've been living with Crawford for quite a few years, that inanimate objects, apart from pieces of paper with statements and things on them, words on them, are testimony? Well, but that's the critical point, Your Honor. It's not an inanimate object. They didn't bring the stamp in and say, here's the stamp, we're stamping it in court. They had the doctor or the pastor, whoever it was, stamp the document, then they brought the paper in and they said, here's the stamp that I got when I was over there in Romania talking to these people. And as a matter of fact, they actually But that person, see, that's what I asked you initially. That person was available when they said, here's the stamp. They didn't bring it in. That's a question of custody. That's not a question of them, the witness isn't coming in and saying, I'm authenticating this and saying, I obtained this from this doctor at this place in Romania. Right. And I think that's the problem. They needed to bring the doctors in to testify. I'm over my time and I'm reluctant to cut into my time. Well, I do want to ask you, though, quickly about the abuse of trust, because that is of concern to me. So I'd appreciate your quick comments about that issue. Well, do you have a specific question or do you want me to just No. All right. Well, so for my client, the guidelines provide that if someone is If someone receives a role, an aggravated role adjustment under 3B1.1, yeah, I may be misciting the number, but yeah, if you get an aggravated role adjustment, you can only get the adjustment for abuse of trust if it's based on an actual abuse of trust, not on special skills. So let me, I guess I do have a specific question. In what circumstances, if any, in your view, can the United States government be the victim or the person who is entrusting the defendant with something? Oh, well, there's many instances. For example, if an employee of the United States government, for example, embezzled funds, let's say an employee of the United States courts who was paying for travel managed to take a trip to Fiji on the government's nickel, I would say there might well be an abuse of trust, depending on the level of discretion. If in the Velez case, which is cited in the briefs, the the that was also an immigration fraud case, the defendant had a special relationship, he had special certification, and the government and that there was evidence that that, you know, caused because he had this special certification, he was, you know, more, there was a relationship of trust. The problem is that here there's not a relationship of trust between an asylum attorney and the government. I think there's a, it's a vast leap between jumping between somebody who, just because you appear before the government, that doesn't create a relationship of trust. I don't think this case is distinguishable from the Evans case, which is the unpublished case. And also the, I believe it's, well, now I've drawn a blank, but there's another case. I apologize. Counsel, you said that the government could not rely on the special skill. And I'm sorry, where is that found? If you read the guidelines section on abuse of trust, and I can't. They're alternatives. They're alternatives. If, in essence, if, so the abuse of trust section is, is you get two points for abuse of trust or special skill. But if you read, but if somebody's getting an organizer adjustment, then they don't also get the two points for abuse of trust. Is that in the application notes, the commentary? Yes, I believe so. It's actually quoted in the brief, so. Okay. Thank you, counsel. We'll hear from whoever is next up. Excuse me, Your Honor. May it please the Court. Chesapree Kulrasingh on behalf of Manjeet Kaur Rai. I'm going to address two errors today, the admission of summary evidence under Rule 1006 and the admission of Agent Webster's lay opinion testimony under Rule 701. A straightforward application of the prerequisite for admission of evidence under Rule 1006 establishes that the district court erred when it admitted Exhibit 75.2 through 75.7. The first prerequisite the government failed to fulfill is that they inexplicably did not provide defendants access to all 330 narratives that were the basis of the charts, even though the law is crystal clear that the defendants were entitled to them. You have to have all the underlying narratives to test the accuracy, inference, and premise that the summary charts are purported to summarize, because summary charts are supposed to act as surrogate evidence. Without having access to all the narratives Agent Webster reviewed to create the charts, the defendants were unable to effectively duplicate the means by which she allegedly created the charts and test the soundness of her methodology. This was of great import to my client. At trial, the government went to great length to link my client to 28 of the 105 underlying narratives listed in the charts. The government's theory is that the frequency of the commonalities in the narratives would impute knowledge of widespread fraud to Ms. Rye. What was not clear, because we didn't have access to all 330 underlying narratives, is how many of the total Ms. Rye was actually exposed to. Now, what was it you didn't have access to, the ones that she was using? We had access to the 105 listed narratives on the charts, but not the 330 narratives she used in aggregate to create the charts. So she handpicked out of those 330, and we don't know how she did that, because we never had access to the 330 narratives. And the narratives were created by? And frankly, the narratives, you can see clearly with the Romanian applicants, there are cases that they presented that were clear evidences of fraud, but a lot of the other cases, they're not. And when you do a comparison of the narratives, I'll get into that a little bit later, it's very difficult. It was impossible for me to recreate what Agent Webster did, to even link, to show accuracy of the charts or relevancy. If I may proceed. So without knowing the actual number of how many applications Ms. Rye was exposed to, we don't know the frequency of the exposure to commonalities. To impute this knowledge of fraud to her as a new lawyer, a 27-year-old lawyer working in this firm, was it one in four applications, as the government would have you believe, or one in 10 or one in 20? We really don't know. How many of the applications were Romanian versus Indian, Nepalese, or Fijian? Without that pool of applications, the charts leave the misleading impression that all of the cases Ms. Rye worked on contained the indicia of fraud. That was the theory the government was able to communicate to the jury, and the theory that Ms. Rye was unable to fairly contest without those 330 narratives. The second prerequisite for admission under 1006 was that the district court failed to make an accuracy determination before admitting the charts into evidence, and in fact, the charts are indefensibly inaccurate. The government argued that rule 1006 was an end run around accuracy, because such an accuracy evaluation was impractical when facing voluminous documents. But in fact, the opposite is true. 1006 summaries are surrogate evidence, and as such, they must accurately represent the underlying documents. A wider concern, so in the interest of time, I'll. In addition to these procedural errors, there's a substantive error of equal magnitude in admitting the charts. Rule 1006 only allows for the admission of surrogate evidence, not pedagogical devices. However, these charts were plainly pedagogical because the parties agree that the only thing they convey is Agent Webster's opinion. I'm going to show you a chart here. This is one of the six. Almost identical. This is Agent Webster's opinion. If I cover this up, there's really nothing on here except for initials and A numbers. And those A numbers weren't even provided in those underlying narratives. This is not summary of – this is not even a table of contents of the exhibit below – of 75.2A. It's really – it's a list that the jury relied on to say all of these cases are fraudulent. Another equally fatal flaw of the charts is that they fail to satisfy Rule 401's relevancy requirement. The Second Circuit explains this problem in Archer, namely that there's no comparative baseline to establish that the degree of alleged similarities are aberrational and, therefore, an indicia of fraud when compared with narratives of other lawyers. And the second point is that the hypothesis that the alleged similarities are an indicia of fraud is not based on a random sampling of the listed narratives. So I'm talking about if you were to compare just these 12, they didn't – the district court nor did the government ever go through any of these 12 and do a random sampling. And in our summary excerpts that we submitted, we tried to do that. We tried to go through it. You seem to have gone deep into your co-counsel's time considerably. Sure. I – that's fine. I'll just leave it to say that Agent Webster's testimony is clearly impermissible under 701B. We briefed that very thoroughly as well as 701C. Thank you, Counsel. Thank you, Your Honor. Good morning. May it please the Court, my name is David Porter. I'm an Assistant Federal Defender, and I represent Yosef Kaza. The issue – the primary issue for Mr. Kaza is did the district court err in imposing upon him the nine-level increase for number of documents under Section 2L2.1B. I was rereading the government's brief last night, and I got to page 93, and I think there is the heart of the case for Mr. Kaza. The government writes, The court recognized at sentencing that defendant's conviction on this count, referring to count 1, the count to defraud, alone provided a sufficient basis to apply the disputed specific offense characteristic. This is completely wrong. It's a completely wrong statement of the law. If this were the law, then Garcia-Sanchez, the case that we primarily relied on, the 1999 case of this Court, would be wrong. If a conviction for a conspiracy were sufficient to impose this specific offense characteristic, the same thing happened in Garcia-Sanchez. There was a conspiracy to distribute more than 5 kilograms of cocaine, and the court there relied on agent testimony about how much cocaine was produced over the life of the conspiracy. There was no objection by the defendant. And they didn't even pause the hearing. Sotomayor, what you have to demonstrate to us in order to succeed on this argument is that the finding of fact that there were at least 100 documents was clearly erroneous. And the court put together its own list, which was, I think, 141 or something like that. It wasn't just blindly saying, well, the government says this or that, and wasn't necessarily accepting any particular legal theory, as you're now arguing. It seemed to me that what the court did was say, okay, here is my count based on all the evidence that I've seen. Why is that finding of at least 100 clearly erroneous? Maybe 141 was 5 too many or 20 too few, but why is that clearly erroneous? Your Honor, first of all, the district court didn't identify which documents they were. It said, I'm not going to quantify the number. And I suggest with an offense characteristic that relies crucially on the number of documents that's there. Well, that's a somewhat misleading characterization of what the district court did, because the court said, I think it's at least 141. I don't need to figure out an exact number, because it's clearly more than 100. So why is that wrong? I mean, if people are arguing between 1,000 and 2,000 and the standard is more than 100, why do we – you know, it's sort of like, why am I going to get into that? Well, I think because the way this progressed, initially they said it was 105 documents. If you recall, the presents reports is 105 documents. And there was this constant moving target, moving target, the government saying, oh, well, here's a chart with 450 and here's another chart with 190. And the district court says, I think it's 141, but I don't have to decide exactly because it's more than 100. Right. And why is that wrong? Where is there a demonstration that it is fewer than 100 and that the district court's finding to the contrary was flat wrong? Two reasons for that. First of all, the court – that chart doesn't link Mr. Kasa to those 141 documents. There are some that link him to the documents. There is an indication that these were documents found at the search of Kasa's home, for example, but not anywhere near 100. And so that's the major problem. But the two other problems are, is that chart that the court used relied on Agent the similarity of narratives of the documents that were submitted in conjunction with the asylum application. And so that's not proof that Mr. Kasa was involved in those. And secondly, the chart also references dismissed counts, documents underlying dismissed counts and acquitted counts. And I suggest to you that reliance on those – those documents is also incorrect. And so, you know, the district court started out the right way. The district court ordered the government to say, identify those documents, over 100, that are – that – identify them specifically and then show me how it links to Mr. Kasa. Those documents are linked to Mr. Kasa. The government never did that. Thank you, counsel. And the only other thing that I would say, Your Honor, is that if – if the court reverses or remands for any other defendant's sentencing issue, that it should remand Mr. Kasa's as well. Thank you. Thank you. Good morning, Your Honors. Dennis Riordan for Defendant Jagdeep Sekhon. As the Court knows, the claim I'm going to argue, the Kadiakos claim, is unique to Mr. Jagdeep Sekhon. And I submit, if not unique, it is extraordinarily rare in the history of Kadiakos jurisprudence, because in most cases, defendants on appeal say, hey, there were two conspiracies or multiple conspiracies here. The Court says the jury got a multiple conspiracy instruction. They obviously found that there was a single conspiracy. That's the end of the matter. In this case, the government has effectively conceded that they committed very serious Kadiakos error, because in their brief, they say count 17 is a conspiracy that Mr. Jagdeep Sekhon had nothing to do with. It is a conspiracy as to which the evidence was very strong, because there were tapes of conversations between a government informant and every other defendant except Mr. Sekhon, and they took the very acts involving those tapes, which they have admitted had no conceivable connection or legal connection to Mr. Jagdeep Sekhon. Sotomayor, the one of the other defendants, Ms. Harmath, I think it is, makes the exact opposite argument, essentially, that it was really all one conspiracy and that it's multiplicitous to have separated out count 17. And if counsel is correct about that, then doesn't your argument fail? Well, I'm not going to address my counsel's argument. I'm going to do it. I understand that. I'm asking you a hypothetical question. If we were to agree with that, what happens to your argument? Your Honor, if the Court were to find that count 1 involved a single conspiracy and the other one involved a single conspiracy, and that included everything including count 17? Then there would not be – well, let me get this right. They're arguing that, yes, 17 is multiplicitous because it's already subsumed  Because it's already subsumed in count 1. But I leave that to the Court. The government has to be clear. I know, but you're not answering my question. Of course you're leaving it to us. Yes. Your Honor, let me be clear. Okay. There was not multiplicity in this case. And the reason for that is that count 17, as the government says, is an entirely separate conspiracy. Okay. My question proceeds from the opposite hypothetical stance. If we disagree with what you just said, if we agree instead that count 1 is the only overarching conspiracy that eats up count 17, which is not really a separate thing, what happens to your argument? Does it have to lose? Your Honor, if this Court were to find that count 1 is a single integrated conspiracy, then our cadiacus argument would fail. But we're in a situation – I would ask the Court this. If there is a conspiracy which a defendant had no part of, admittedly, how can that – those acts in that conspiracy be considered part of a conspiracy that he did – is charged with engaging in? It's a logical impossibility. They have said count 17 is something that did not involve Mr. Jagdeep Sekhar. How can you then put that in count 1? Could the jury have convicted the remaining defendants on count 1 if it believed that the only basis for count 1 was those allegations that were also found in count 17? I would submit that because count 17 was very strong, the government argued in count 1 that you can find a count 1 conspiracy based simply on count 17. But how could they find that conspiracy with respect to your client? Which conspiracy? If the jury thought that count 1, that the only basis for count 1 was the agent who comes in to see them, it was just also the basis for count 17. Right. Well, they could say there is a conspiracy. We already know that from count 17 involving four of these defendants. So if that's alleged in count 1, there's a conspiracy. And now we look at the indictment. Here's an overt act which involved Mr. Jagdeep Sekhar. Yes. Your client isn't charged with count 17, is that correct? Absolutely not. They conceded that he had nothing to do with it. All right. But could the jury have decided that count 1 was based only on the allegations which were also alleged in count 17 and felt that your client was a part of that conspiracy? Yes, they easily could have because he was charged with a legal overt act in count 1, attending an immigration hearing. So they could say, okay, there's a conspiracy. They've alleged his involvement was this legal act. He did the legal act. We found a conspiracy. Therefore, he's guilty of count 1. There was only one act that went to the jury as to Mr. Sekhar and was literally going to an asylum hearing with a client, which he was obliged to do. That's what lawyers do. So they find the count 17 conspiracy, which the government argues is the basis of count 1 as well, and they say, well, the government alleged an overt act that Mr. Sekhar admittedly committed, so he's guilty on count 1 as well. Let me point out one other thing. There is a defendant here named Voriaba who was charged in, let's say, count 11. Okay. Mr. Sekhar, Jadip, was not charged with that. Three defendants were convicted. It's entirely charged as acts in Sacramento. That's a second conspiracy, which apparently the jury found to have existed in Sacramento, which was also alleged as part of count 1, even though Mr. Sekhar had nothing to do with it, wasn't charged with it, and the evidence didn't support that he had anything to do with the violations as to Mr. Voriaba, which was charged in count 11 and three separate overt acts in count 1. So what we have here is just classic Caliaco situation. We have a, at best, marginal case against a very highly respected immigration attorney, who often appeared before this court, and we have things that the government said were in Sacramento. We're not charging him with them. We've conceded that the Sacramento conspiracy he was not involved in. How can that go in to count 1 if those acts had nothing to do with any conspiracy he was part of? Thank you. Thank you, counsel. You've used up almost all of the time available. Okay. I understand your position. I do want Mr. Wiseman to come up, because I do have some questions. And we will still give you your four minutes for rebuttal. Thank you, Your Honor. I would like your view of what makes a conspiracy count multiplicitous. I have difficulty with the concept. I don't know what test were to apply to determine whether two counts or three counts or two or three conspiracies are or are not multiplicitous. And the second thing I'd like you to address is even if we were to agree with you that 17 is encompassed in number one, what difference would it make to your client? She was convicted of three counts, and this would make it two, and what difference would it make to her? Your Honor, I will attempt to answer the Court's questions. From the beginning, the Court would obviously have to look at the Guzman case out of the circuit to determine the factors and apply the factors to determine whether or not in this particular case there is a multiplicity argument. And as the Court knows, there are simply just five factors that we pointed out in the briefs, the brief. And let me just simply go through those factors. The conspiracy alleging count 17 temporarily, from the time frame, just is subsumed into the conspiracy in count one. If you look at the one where to look at the time frame that the indictment alleges, you have count 17 just coming right under the time frame of one. And in terms of location, where are we? Well, in the – with respect to the locations, both conspiracies talk about the location being in Sacramento. For example, count one, the intake interviews in the Seacon, Sacramento, office refer to the false asylum applications. And then in count 17, the evidence of trial showed that the conspiracy took place not only in Sacramento, but also in San Francisco. So from a geographic point of view, you have an overlap there as well. So that would be the second factor under the Guzman factor. And with respect to the third factor, the identity and the roles of the indicted co-conspirators, again, you have the same situation, essentially. You have these co-conspirators. Sotomayor, there are more people in count one than in count 17, which was Mr. Reardon's whole point. That is correct. And my understanding, in looking at the indictment, is that Jadip is the only additionally charged individual in count one who is not charged in count 17. But putting that aside, you still have a situation where you have a coalescence of the identity of the co-conspirators. And essentially, if you look at the indictment, for example, beginning in excerpts of page 007, you see that they're essentially, in my view, with respect to Mr. Reardon, my view is that the overt acts in count one and count 17 are virtually identical. As a matter of fact, half of the overt acts that are alleged to support count 17 are taking verbatim from the allegations in count one. Well, they were all they all involved the same business. And they all involve the same object in that sense. But 17 involves a person who was an informant, right, who the government, of course, got to send to get in there and who created the problem for it. And one is the conspiracy where the people are coming or they dig them up or they walk into the office of their own accord and they get the and they prepare these applications. Now, isn't there a difference between the two? Well, Your Honor, I would suggest that count one is this overarching scheme that I've done. Count 17 is merely a That's your reading of it. That's my reading of it. And my reading is simply based upon the indictment and based upon what my recollection of the transcripts reflect in the testimony. So I think merely because count 17 dealt with an individual who factually may have been slightly distinct from the those individuals in count one, count one really subsumes the entire operation of this firm. That's the argument. Is there any room for ambiguity here? I mean, for example, could the government say there's one conspiracy involving people from India, there's another conspiracy involving people from Romania, or, I mean, one involving the Sacramento office and one involving another office? Is there only one right answer when you apply the Guzman factors? Well, Your Honor, no. I don't think so. I know my time is up, but let me just answer quickly. I think there is one right answer. There may be a situation where you can have distinct conspiracies, but in this indictment and based upon the evidence that was proved at trial, my view is that you do not have you have this whole discrepancy. So they couldn't have sliced it in your view in any way? I think they could have sliced it, but in this particular case it wasn't sliced fine enough to make the distinction. And I think basically you're left with one overarching conspiracy and you have a multiplicitous problem here because you basically count one as what is alleged. Finally, to the question of what difference it makes, because your client has a very, very lenient sentence. That is correct. And also, regardless of what would happen here, there would be two at a minimum convictions. What so where's the harm? Well, essentially, Your Honor, the simple harm is that I believe that there is an additional fine which is fairly minimal for each count of conviction. But the other point is, is that if, like any other defendant, if she should not be saddled with a conviction on her record because it's an illegal conviction, then even if the consequence of that is somewhat minimal, it ought to be corrected for her sake and for the record's sake. Okay. Thank you very much. And as I said, we had a lot of questions, there are a lot of issues, and you'll still get your four minutes. So now we'll hear from the government. Good morning. May it please the Court. I'm Camille Skipper. I'm here with co-counsel Kyle Reardon. We were two of the three trial counsel in this case. First, I'd like to address the multiplicity issues, since you just left off with that. It's clear from the government's brief that this was not our most vigorous argument, and that it wasn't our most vigorous argument. There are certainly issues, and in the briefs we called it a close question. In preparation for this argument, on Friday, Mr. Reardon was going through the transcripts, looking at questions related to the admission of the charts. And there was an argument made then by Jadveep Sekhon's attorney, Mr. Drattman, that we were really talking about two conspiracies here, and the inclusion of information on the charts related to the Count 17 conspiracy, along with information related to the Count 1 conspiracy, prejudices client. At that point, one of the government counsel rose and said that actually what we really have here is one overarching conspiracy with a, with the small conspiracy. Well, to be frank with you, that's what it looks like to me, too. And I'm only speaking for myself, and this is very tentative. It's just for the sake of the discussion. Because it seems to me that the fact that some are quote unquote real clients, and one is a decoy client, doesn't seem to really distinguish the, the mindset of the defendants, which is really the question, what was it they agreed to, allegedly? And there really wasn't an effort to divide it by geography or, or, or timing, and it, it does look like one big scheme to submit a lot of fraudulent applications of various kinds over a long period of time. So if, if we were to come to that conclusion, what follows from that in your view? If the court reaches that conclusion, then the court would vacate the convictions on count 17 and remand for resentencing of those four defendants. Certainly, were we to return to the district court, our argument would be that they should be sentenced to the same amount of time that they were originally, because no conduct was lost. It's, if it's, if count 17 is subsumed into count 1, then all of the same conduct applies. Certainly, each of those defendants would then have a $100 special assessment return to them, and have suffered one less conviction. But it would be the government's argument that the custodial sentence should be the same. Well, that's not for us to decide anyway, but I understand your position. Let's talk about the stamps and the signatures. That's your other, one of your other topics. Yes, Your Honor. As presented in the briefs, the government has a couple of positions that it takes. First, we argue that the stamps and the signatures were not themselves statements. We argue that they were not, if they were statements, that they were not testimonial in the sense of Crawford or the Confrontation Clause. And we also argue that even if this court were to find that they were testimonial, harmless error applies. Each of these topics has been addressed in the opening arguments. I would make a couple of clarifying comments. One, Judge Vida, you asked about Dr. Engel's testimony. It's not a large point, but I would just note that her testimony relates to two asylum applicants instead of one. There were many, many more above the two. So the difference between one and two isn't that great. But what we would say is that the testimony that she provided concerning how her stamp and signature were used in a fraudulent supporting document would be enough for the jury to conclude that this was the conduct of this firm. It definitely falls in line with the theory that was presented at trial. And moreover, it was indeed the least importance of the evidence that the government were fake. Most of the evidence that went to the fact that the documents were fraudulent came from direct testimony of individuals who said the story was fake. And the stamps and signatures and other parts of documents that were found in Yosef Kaz's home on floppy disks. In addition, there were templates that were found on the firm's computers. And there was also some communication between Yosef Kaza and Defendant Manjeet Rai about one of the supporting documents where she was instructing him to change a date. There was so much evidence concerning the fraudulent nature of those documents. This evidence compared to that was minor in the extreme. Dr. Engel's testimony, however, was useful in that it gave the jury a view of the evidence into how a doctor in Romania would complete the sort of documents that she purportedly completed and she testified that she, in fact, would not have been the doctor that would have produced those documents in the first place. So, certainly, if this court finds that it was testimonial, the admission of those stamps would have been harmless. And then I will move very quickly to the Kotiakos spillage argument. If this court finds that the indictment was multiplicitous to Counts 1 and 17, then Jagdeep Sekhon's argument does fail. The evidence supporting Jagdeep Sekhon's conviction on Count 1 was very strong. I'm not going to go through it now because the Court has already told us not to argue it. I would just note that it really isn't just based upon the recorded comments of the other four defendants with the CI. The government presented direct and circumstantial evidence related directly to Jagdeep Sekhon himself on Count 1. And if the Court has any questions about those issues, I can turn it to Mr. Reardon. I don't believe we do. Thank you. May it please the Court. My name is Kyle Reardon. I would like to begin my discussion of the topics that I'm going to discuss with an analysis of the charts. And I'd like to first correct what I believe to have been a misstatement. There was a statement made by counsel that the defense was not given access to the 330 charts, which formed the base, or the 330 asylum narratives, which formed the basis for Special Agent Webster's charts. We believe this to be false. The defense counsel had access to all of the A files in this case. There was discussion in the record on February 19th about getting access to that, at which point the United States informed the Court that it had provided all of the materials with the exception of two A files. There was additional discussion on May 6th. Wait, so you did or you didn't provide all of the files? We did. And there were two more which were pending, and we provided them subsequently to defense counsel. And the issue was raised again on May 6th, and it's on page 3762 of the record, in which the United States represented, quote, all of these A files have been available for a long time. And that was the case. The prior defense counsel had taken a great deal of time to review and scan all of the relevant A files in this case. The files were in the local immigration office, which is approximately five to six blocks from the courthouse, because of their voluminous nature and because of the fact that the they were kept within the ICE office. Defense counsel was given access to those documents. And in addition, on multiple occasions when defense counsel complained of not having access to documents, for example, again, that May 6th hearing, there were 18 files which defense counsel requested which were produced by FedEx the next day. There were four additional files at a later hearing which were produced the next day. Sotomayor, the relevant portion of the A file was the application for asylum, wasn't it? The relevant portion of the A file was the application for asylum. And the relevant portion of that application, as it concerned the charts, was the asylum narrative, that five to seven page description of abuse that was submitted with the I-589 application. All of those materials were provided, and specifically as it concerned the charts, those documents were provided and admitted into evidence. 75.2 had a corresponding Redwell, 75.2a, which contained all of the narratives supporting that particular chart. And so, again, I dispute counsel's view. They were prepared by the law firm? They were prepared by the law firm, yes, on behalf of the law firm. I think the application is not the chart, obviously. Right. The application is the underlying document. Yes, Your Honor. The applications were prepared by the law firm. The charts were prepared by Special Agent Webster. And I take it there's never been any claim that there were other applications that were totally different that the government ignored or anything like that? No claim that I'm aware of. And as it concerned this case, there were Romanian and primarily Romanian, Eastern European applications, and Indian or Punjab applications. And so it's the government's position that it was not an abuse of discretion for Judge D'Amoral to admit those charts into evidence. They were properly admitted under 1006. It was well within his discretion to admit them, and it was well within his discretion to allow them to go to the jury during their deliberations. The other issue which the Court has addressed this morning, which I am prepared to brief or to argue, are the two sentencing issues, relating to both Mr. Kaza and Mr. Jack Preet, SACOM. As it concerns Mr. Kaza's sentencing, the government obviously believes that there was no clear error in this case. The record as it concerns his sentencing and Judge D'Amoral's application of the nine-level increase is really extraordinary. Mr. Porter argued that the number of asylum applications linked to Mr. Kaza was a constantly moving target. And I think Judge D'Amoral's defining of the number of applications down to that 141 number is an example or is a manifestation of how he took that moving target, the arguments from both sides, and distilled it into his findings. The chart is quite extraordinary. The government submitted a chart with more than 500 items we believe to be fraudulent, based on everything from witnesses who testified who said their application was fraudulent all the way up to addresses which were the same or initials which were the same or any indicia of fraud which was relevant to the case in chief in this case. Judge D'Amoral took that and he narrowed it down to 141. And so to argue that his finding was clearly erroneous is simply to fail to see what's in the record. And the government believes that the nine-level enhancement was proper. One of the arguments that counsel made was that there were fewer than 100 because in many instances the specific documents were not linked specifically to Mr. Kaza, that is, not found on the floppy disk in his house, or not otherwise with his particular fingerprints on them. What is your response to that argument? Your Honor, Mr. Kaza was convicted of, among individual counts, convicted of his role in the conspiracy. And it's the government's position that having joined that conspiracy and having been aware of the objects of that conspiracy, he is responsible for what that conspiracy then does. Judge D'Amoral made particularized findings about Mr. Kaza's role in the conspiracy. He says he looked at the documents and found Mr. Kaza to be a major figure in the Romanian community. He was a central figure working with that law firm. And he went through and made the particularized finding of excluding Mr. Kaza from the non-Romanian applicants. And so given Mr. Kaza's conviction on the conspiracy and his role in the conspiracy, as the government argued and Judge D'Amoral founded, it was not clearly erroneous to hold him accountable for all those documents, regardless of whether or not he may have been acquitted or the government may have dismissed counts relevant to those documents. As the Court understands, the standard is different at sentencing than it is at trial. And the items that the judge can consider at sentencing are different than those that a jury might consider at trial. I also had a question about the abuse of trust enhancement, which was not listed in your filing as one of the things you were intending to discuss. But again, speaking only for myself, I'm quite troubled by the way that was applied in this case. What was the position of trust that these defendants held with the United States? They came to court. Like any lawyer who presents papers, are we all subject to an abuse of trust enhancement when something goes awry? I don't believe so, Your Honor. And I believe that the distinction here and the one that the Court made is the unique circumstances of the asylum process. And that takes these defendants out of the realm of the advocate that might appear in a criminal context or in a civil proceeding. But the government is supposed to make its own independent determination. It doesn't rely on the lawyer or the applicant. I mean, I suppose it relies in the sense that it has to make a credibility determination if it goes to a hearing. But why is that any different than a pleading in a civil case where, you know, the lawyer puts something in that he or she knows to be false that's, you know, sanctionable, perhaps criminal, but I'm not sure why it's an abuse of trust. I would argue in this context, Your Honor, that the distinction is that as it was testified to during the trial, the asylum process in the initial stages is nonconfrontational. Mr. and I forget his name at this point, but one of the first witnesses who testified on behalf of the government testified about how the asylum process worked. And it was a nonconfrontational interview in which the fundamental inquiry was the legal sufficiency of the applicant's claim. And the distinction that I'm drawing here is that, essentially, the asylum officer's role was to not confront or challenge or test the litigant's claim, but simply to see if there was a sufficient basis for the claim. And so unlike a traditional court proceeding where you have argument and folks can raise objections, you're dealing with a proceeding in which the asylum officer's task is to analyze the documents provided by the applicant and his law firm, if he's represented, and to see if there is a basis for granting asylum. And so it the trust that the United States places in the defendants in this case was a trust not to abuse that presumption that applies in proceedings. What is the concept of trust? Is it like a fiduciary? I would have trouble applying a fiduciary or sort of a business relationship type concept to it. I would simply classify it as the government has in its brief, which is the immigration office is relying upon, again, in this case the defendants, to present truthful information. It's not argument. It's not advocacy in the traditional sense. It is a truthful and accurate claim of the asylum applicant's claim of abuse or persecution. Well, that seems to me, most of the times that I've seen the abuse of trust, it has been in a fiduciary context, but that may be. I think it has. And I think it's, as the commentary notes, the examples in the commentary are all geared towards the person in the business that has been given a position and then abuses that position. There are cases which this Court has relied upon, which other circuits have relied upon, in which, as cited in the government's brief, it's the Medicare doctor who's receiving reimbursement from the government, or it's some other person that the government has trusted with providing accurate information to them. And I believe, or the United States believes, that this is one of those cases where the asylum office and the asylum process trusts the applicants and their attorneys to provide accurate information because of the fact that the proceeding is non-confrontational and because of the fact that you're merely testing the legal sufficiency of the claim. If there are no other questions from the Court. I think we have no further questions. Thank you. Thank you, Your Honor. And the appellants collectively have four minutes. I just have a couple of points. First, on abuse of trust, you know, the government's position would basically put immigration proceedings in this world of their own, that asylum proceedings somehow are so non-confrontational that the, I mean, arguably that not only their lawyers but the applicants themselves would have a position of trust with the government. And I just think there's no evidence of that. From all the immigration cases that this Court sees, I think the Court is well aware that these are highly disputed adversarial proceedings. You know, even if the initial ---- Which of the defendants does the abuse of trust relate to? Well, my client, Jagpreet Sekhan, I believe that Mr. Reardon's client, Jagdeep Sekhan, also received the adjustment. And I don't know that Mr. Kaza didn't, but my client did. And just quickly, you know, Medicare is very different, and I explained that in the reply brief, but in Medicare, doctors sign up, doctors and other medical providers actually sign up with Medicare. They have an agreement with Medicare. And part of the agreement is they get paid in advance. They submit their claims. Anyway, I won't ---- I don't want to use up all my co-counsel's time. And I'm willing to submit. We have such limited time. Thank you. Thank you. Thank you, Your Honor. The government has continued to mischaracterize, providing the 330. And I'll just give you citations. I'd love to read from the transcript. But Joint Excerpts of Records 452, 453, the motion in limine transcript 195, and then a long discussion at Joint Excerpts of Records 422 through 24, which was on the day of the trial, I have to say. And then please feel free to look at the 3462, which the government cited. They did not. They provided 195 on a disk, and they also provided the 105 listed narratives, which are duplicitous of some of them on the disk. We dispute that entirely. In addition, there's a discussion about accuracy that's still in play in Rule 1006. And I'll refer you to Joint Excerpts of Records 428, where the government very heavily defends just the exercise of going through and highlighting what passages are similar in the underlying record. In the interest of time, I do want to say that my client is the only one who hasn't served any time. She has a 30-month sentence. And if you look at any of the evidence that's against her without the lens of the summary charts and the lay opinion testimony, both of which are clearly inadmissible, even the audio tape recording of the confidential informant in her doesn't stand to show that she should be convicted. Thank you. Thank you, counsel. There's one minute left. Mr. Breeden. I'm going to ask for 30 seconds, Your Honor. I'm not going to repeat anything. I am going to respond directly to something that you said, Judge Graber, during the government's argument that raises an issue that you absolutely must consider. The government, in its brief, said Jagdeep was not a member of a conspiracy related to the confidential informant. Answer at 116. The Court is saying, well, we may find the government wrong. We know its case better than it does. It actually was a single conspiracy, and he was a member of a conspiracy that related to the informant. If the Court were to find that, it has to deal with an issue that hasn't been raised because the government conceded the existence of two conspiracies. At a minimum, if the government would take the position that this was a matter of fact, there might be a single conspiracy as opposed to two. If the government took that position, our response would be there was reversible error because then the district court had a plain error under the plain error standard, was required to instruct on the multiple conspiracy question and have the jury decide whether there was a single or multiple conspiracy. That instruction was never given, and the whole issue wasn't argued on here on appeal because the government conceded the existence of multiple conspiracies. So I would submit, Your Honor, if you followed your inclination, you would have to order supplemental briefing on whether the Court committed plain error by not instructing on the factual questions of multiple versus separate conspiracy. Thank you, counsel. The case just argued is submitted, and we appreciate very much the arguments of all counsel. They've been quite helpful. Yes, sir. Okay. All right. Go for it. Just the Studley rule that is cited in our brief that it was adopted by this Court in Ortiz requires particularized findings of joint criminal activity, and so we believe that that's where the district court went wrong here. Thank you very much. I appreciate your honor. We still appreciate all of you, and it was very, very helpful. Very helpful arguments, and the cases are submitted. All rise.
judges: SCHROEDER, GRABER, BYBEE